IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LARK L. STUTTS,

      Plaintiff,

v.                                     Case No. 6:14-cv-01150-JTM

CITY OF MCPHERSON, KANSAS,

      Defendant.

MEMORANDUM AND ORDER

      Plaintiff Lark Stutts was a police officer with defendant City of McPherson from March 2008 until May 2013, when the City terminated her employment. She claims the City discriminated against her on account of gender and that it unlawfully retaliated against her when she complained of gender discrimination. The matter is now before the court on the City's motion for summary judgment. For the reasons set forth herein, the court finds the motion should be granted.

## I. Legal Standard

      "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed.R.Civ.P. 56(a). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 927 (10th Cir.2004). "The movant bears the initial burden of

making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol–Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir.2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party resisting summary judgment may not rely upon mere allegations or denials contained in its pleadings or briefs. *Id.* at 256. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 249–50. Once the moving party has carried its burden under Rule 56, the party opposing summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita* ).

## II. Facts

The court finds the following facts to be uncontroverted for purposes of summary judgment.

Plaintiff was hired by the City as a patrol officer on March 25, 2008. At that time, Dennis Shaw was the McPherson Chief of Police and K.T. Gent was Assistant Chief of Police.

Officer evaluations in the McPherson Police Department consisted of a numerical rating from 1 to 7 on thirty-one separate criteria, with a 1 or 2 constituting an "Unacceptable" rating and a 6 or 7 constituting a "Superior" rating.

Asst. Chief Gent was one of the supervisors responsible for preparing Stutts's performance evaluations. Gent's evaluation of Stutts for the period from March 2009 to April 2010 reflects that Stutts received a 2 (unacceptable) rating for "Acceptance of Feedback," "Report Writing: Appropriate use of time," and "Radio: Listens and comprehends." She received no ratings of 6 or 7. Based on the ratings she received, Stutts understood Gent's evaluation of her to be poor.

After being presented with her 2010 evaluation, Stutts understood that Gent and other supervisors had articulated Stutts's acceptance of feedback and argumentativeness as areas of concern. Gent told Stutts during her performance evaluation that her supervisors were saying she did not accept feedback, although he gave no specific examples.

Gent's evaluation of Stutts for the period from April 2010 to November 2011 reflected: "[S]till argumentative with supervisors when being talked to about performance" and "Supervisors are still reporting that she makes excuses when talked to about her job performance."

3

Chief Shaw retired in June 2011. Robert McClarty became Chief of Police on October 31, 2011. Asst. Chief Gent retired in the Spring of 2012 and was replaced by Mike Terry.

Stutts's evaluation for the period from November 2011 to March 2012 reflected ratings of 2 (unacceptable) in "Acceptance of Feedback" and "Radio: Listens and comprehends."

On October 20, 2012, the McPherson Police Department received a citizen complaint (the "Nelson complaint") alleging that during a noise complaint, Stutts had entered a citizen's home without probable cause or permission. Captain Martens investigated the complaint and concluded that Stutts could have handled the situation more professionally. As a result, Stutts was counseled and given instructions on how to handle noise complaints in a more professional manner.

On November 16, 2012, Stutts met with Sergeant Johnson and Lieutenant Reed for field sobriety test re-training. Lt. Reed perceived Stutts's behavior to suggest that she did not believe the training was necessary and that they were wasting her time. He reported to Chief McClarty that Stutts appeared irritated and responded "Okay" or "I know" in response to critiques.

On December 4, 2012, the City of McPherson received a citizen complaint about Stutts's conduct during a traffic stop. Capt. Martens investigated and identified several issues with the stop. During a meeting between Martens and Stutts, Stutts maintained that she had done nothing wrong and that "the guy was an ass, bottom line."

On December 16, 2012, during a report-writing class led by Detective Brink, Stutts remarked that Capt. Martens had been "bitching" about how officers were not making notes on the back of notices to appear.

On January 7, 2013, McPherson City Prosecutor John Klenda called Capt. Martens to inform him that on November 29, 2012, he dismissed a speeding ticket because Stutts had not brought necessary information to court about the radar gun she had used during a stop.

On January 12, 2013, Capt. Martens and Lt. Reed met with Stutts about a citizen complaint (the "Bryant complaint"). Martens advised Stutts that Bryant had written a statement indicating he had come in and asked Stutts to prepare an accident report but that she had not taken the report. Stutts remarked that "the guy was an ass" and that she had done nothing wrong. She said she told Bryant that she needed his car to do a report and that Bryant did not have the car with him at the station.  Martens reported to Chief McClarty in a memo that they had tried to explain to Stutts that "the public are our customers and we need to do our best in helping them," but that Stutts "didn't seem to want to listen anymore" and "repeated that she didn't do anything wrong."

On February 7, 2013, Martens wrote a memo to Chief McClarty recounting the foregoing matters and recommending that Stutts be suspended for two days.

At some point prior to February 27, 2013, Asst. Chief Terry approached Chief McClarty and told him that something needed to be done about the ongoing performance issues with Stutts. McClarty instructed Terry to pull Stutts's personnel file so he could review it.

5

Following his review of the file, McClarty made a bullet point recap of Stutts's issues from October 2012 through February 2013 and discussed them with Asst. Chief Terry, Capt. Martens and Lt. Reed.

On February 27, 2013, Stutts was called into Chief McClarty's office for a meeting with McClarty and Lt. Reed. It was department policy to have two supervisors present for disciplinary meetings so that one could serve as a witness. Stutts was given an "Employee Warning Notice" informing her that she had been suspended for two days and placed on probation for six months. The Notice advised Stutts that she was ineligible for promotion during her probation. The Notice further stated that "[w]hile no single incident would warrant the discipline imposed, the combination of issues does."

While Stutts was employed with the City, patrol officer jobs were titled, from least senior to most senior, as P-4 through P-1. The transition from P-2 to P-1 patrol officer is not technically a promotion – both jobs are the same rank and receive the same pay. But it involves different days off and a P-1 patrol officer acts as a field supervisor if a lieutenant and sergeant are unavailable. The normal progression to becoming a sergeant was to move from P-4 through P-1.

The discipline imposed on Stutts on February 27, 2013 occurred right after the Police Department began interviewing candidates for an open detective position. Stutts believed Sgt. Snyder would get the detective position, which would create a sergeant vacancy that would likely be filled with a current P-1 officer, which would in turn open

up a P-1 patrol officer spot. Stutts believed she would get the open P-1 spot because she was the most senior P-2 patrol officer.

A P-1 spot in fact opened up, but Chief McClarty selected Officer Gabriel Ramirez for it. Ramirez had been hired on October 20, 2008. (Stutts was hired in March 2008). McClarty testified in his deposition that in deciding who to select for the P-1 position, he reviewed each candidate's performance and disciplinary history and chose Ramirez as the most qualified.

On February 28, 2013, Stutts sent Chief McClarty a letter requesting a grievance of the discipline imposed on her the previous day. In her grievance, Stutts objected to the imposition of discipline for the above incidents. With regard to the "Nelson complaint," she disputed the citizen's contentions. Stutts also objected to discipline for her attitude during December 2012 training, asserting that the matter was not raised until three months after the incident. She objected to discipline for not bringing required information to court, stating that she had received no instructions from the department about checking serial numbers for radar unit tuning forks. She objected to discipline for the December 4 traffic stop on the grounds that she violated no policy or procedure. She objected to discipline for allegedly refusing to write an accident report, stating that she did not refuse to write the report but could not do so without the car and the proper information. She asserted that she was being subjected to discipline to prevent her from being eligible for the upcoming P-1 patrol officer vacancy.

On March 1, 2013, McClarty acknowledged the grievance request. On March 7, 2013, McClarty notified Stutts that he had determined that the initial discipline was

appropriate. Among other things, McClarty found as follows. Regarding the October 20, 2012 "Nelson complaint," he found that the citizen's "subjective impressions of the encounter were not entirely accurate," but that Stutts's conduct "was below departmental standard because it was unnecessarily abrupt, rude and forceful, creating a negative interaction with the public." As for plaintiff's negative attitude during field sobriety retraining, McClarty noted that the retraining was prompted by problems that an officer reported concerning Stutts's handling of a DUI stop, and that both Lt. Reed and Sgt. Johnson recorded Stutts's unreceptive attitude shortly after the training. With respect to Stutts's alleged failure to bring needed information to court, causing dismissal of a ticket, McClarty found that Stutts was "simply unprepared" and that she "took two radar certificates (without good reason), could not testify to the tuning forks used on the actual unit[,] and did not bring the video." He concluded that "[i]nstead of taking responsibility for the action and having a trainable event, you have again attempted merely to shift blame to another party." As to Stutts's objection to discipline for the December 4, 2012 traffic stop, McClarty found the incident was "an example of your problems interacting with the public." He found that the violation was not on video (contrary to department policy), and that Stutts's handling of a proof-of-insurance issue and the length of the stop were below acceptable standards.

Stutts has no information as to how Ramirez's job performance was viewed compared to hers and has no knowledge about any discipline issues involving him, although his performance evaluations are part of the records in this case. Stutts testified that Ramirez had previously told her he and Lt. Reed once almost came to blows in a

conversation over paperwork, that he had been called into Assistant Chief Terry's office before, and that he has at times been afraid of losing his job.

On February 27, 2013, the same day Stutts received the above discipline, she was dispatched to Peters Lumber Co. The owner, Tom Peters, reported recovering a U-Haul wheel dolly that had been reported stolen. Upon arrival, Stutts asked Peters for a serial number or VIN number for the dolly, but Peters could not find one. Peters called a U-Haul representative in Kansas City for help and handed the phone to Stutts. According to Stutts, the man on the phone kept arguing with her, so she told Peters "I can't talk to him" and handed the phone back to Peters. She said she was going back to the police department to see what she could find out. Stutts eventually called Peters, got an equipment number for the dolly, and learned that it had been reported stolen by a law enforcement agency in Arkansas. Stutts decided not to prepare a report because she had not seized the property and the matter was an "outside agency assist."

In his March 1, 2013 letter to Stutts, Chief McClarty advised Stutts that another citizen complaint had come into the department. On March 7, 2013, Capt. Martens met with Stutts and advised her that the U-Haul representative had called on February 28 to make a report but indicated he did not want to talk to Stutts because she had been rude and difficult. Stutts denied she had been rude or difficult and said she did not know why the representative would say that. During the meeting, Martens told Stutts that she should have prepared a report because she had spoken with another agency and had the dispatcher confirm that the property was stolen.

9

On March 9, 2013, Stutts prepared a letter detailing her meeting with Peters and her discussion with the U-Haul representative. Stutts asserted that she had tried to explain things but that the U-Haul representative was argumentative. She admitted handing the phone back to the lumber yard owner and saying, "I can't talk to him." She explained in her letter that "I can't help someone over the telephone if that person continues to argue with me while I am trying to gather information…." On March 13, 2013, Stutts had a meeting with Terry and Martens about the U-Haul incident. When Martens asked why she hadn't done a report, Stutts said the department does not do reports for outside agency assists. Martens disagreed, saying a report should have been done. Stutts said she would do it that way next time. During the meeting, Stutts was presented with a letter of counseling about the incident. It stated that she would be placed on probation for six months and would have weekly meetings with Capt. Martens and/or Lt. Reed.  It also stated that she would be required to attend a class called "Power Communication." Stutts did not timely file any grievance with respect to this discipline.

On March 13, 2013, Stutts was dispatched to a domestic disturbance call, but she stopped at her home on the way there to pick up her portable radio, which she had forgotten. Stutts failed to tell Lt. Reed that she had forgotten her radio prior to being dispatched. After she was dispatched, Stutts failed to tell anyone that she was first stopping by her home.

On March 11, 2013, Chief McClarty met with former Chief Shaw about an unrelated matter. During that meeting, Shaw told McClarty that an acquaintance had

approached him about a citation Officer Stutts issued to the man for failing to yield. The man did not believe the citation was justified. McClarty assigned Capt. Martens to investigate the matter. McClarty advised Stutts of this "Schlesinger complaint" in his March 13 letter of counseling.

On March 13, 2013, Stutts wrote a letter to Thomas Brown, the mayor of McPherson, requesting a panel hearing concerning her February 27, 2013 discipline. Stutts asserted that her actions had been criticized when similar or more serious conduct by male officers was overlooked. She asserted that most of the counseling she had received was over subjective matters and was not for an objective violation of policy or procedure.

On March 14, 2013, Capt. Martens and Asst. Chief Terry met with Stutts to discuss the Schlesinger incident. Martens told Stutts he had reviewed the "ICOP" video of the stop and concluded that Stutts did not have probable cause or reasonable suspicion to stop Schlesinger. Terry asked Stutts to prepare a letter summarizing the incident and the incident with her forgotten radio. In her letter, with regard to the Schlesinger stop, Stutts said there were times she had heard the local prosecutor and judge disagree over traffic ordinances and that the judge has the final say, and that Capt. Martens had discussed her conduct "which is also subject to interpretations by the public, other officers, and/or supervisors." As to the incident where she went home to get her radio after being dispatched to a domestic disturbance, she said that "because of the history between these two individuals I felt it would be okay to stop at my home to [pick up] my radio." Stutts believes other officers were not required to write statements

about what they discussed during counseling sessions, although she does not know whether others officers were on probation at the time or had been counseled about accepting feedback.

On March 18, 2013, Stutts filed a charge of gender and age discrimination with the Equal Employment Opportunity Commission (EEOC).

On March 21, 2013, Lt. Neufield had a 15-20 minute conversation with Stutts about making corrections to an accident report she prepared. During the conversation, Stutts disputed the corrections that Neufield identified. On March 22, Neufield had a separate discussion with Stutts after she failed to make the corrections he had identified the previous day.

On March 21, 2013, Stutts was presented with her evaluation for the period from March 25, 2012 to March 25, 2013. Stutts's performance was rated as "unacceptable" in the following categories: Acceptance of criticism; Knowledge of Policies and Procedures: Field performance; Knowledge of Traffic codes: Field performance; Orientation/response time to calls (knowledge of local geography); Routine forms: Accuracy/completeness; Report writing: Appropriate use of time; Officer safety: General; Problem solving/Decision making (Judgment); Radio: Listens and comprehends; Relationships with citizens in general; Relationships with other department personnel.

On March 27, 2013, Lt. Reed observed that Stutts had not brought her radio to work.  When approached, Stutts explained that she had gotten up late that morning.

On March 27, 2013, Stutts approached Capt. Martens about a malfunctioning radar. He told Stutts that Officer Wylie was responsible for fixing radars and that Wylie was on second shift. Stutts responded that she was just going to put the radar back in her patrol vehicle. Martens said "no" and instructed her to fill out a "blue slip" and put the radar in the patrol room for Officer Wylie.

During a subsequent conversation with Lt. Reed, Reed asked Stutts to prepare a statement about the radar unit and forgetting her radio, although he told her it was voluntary to do so. She began to do so but changed her mind, tearing up the statement and putting it in the shredder box. She told Reed that she felt like if she wrote something down "they will use it against her." On March 28, Capt. Martens directed Stutts to prepare a written statement about the forgotten radio and the radar, which she did.

On March 28, 2013, Stutts informed City Clerk Tammy Seely that she believed she was being unfairly disciplined for filing her grievance. Stutts had a second meeting on March 28, 2013, with Seely and with City Administrator Nick Gregory, who placed Stutts on paid leave until April 1, 2013, while they investigated her claim of retaliation. On April 1, 2013, Gregory provided the City Commission with the results of the investigation. His memo stated:

> In our investigation of the violation of department policy which requires officers to wear their radios, it appears proper action was taken by supervisors to provide verbal counseling to Officer Stutts. Though it was acknowledged that forgetting a radio has happened to multiple officers in the McPherson Police Department, it was also acknowledged that progressive disciplinary action for

> forgetting a radio multiple times is an appropriate measure. In this case Officer Stutts readily admits that she had forgotten her radio on multiple occasions (3 times confirmed). Two such incidents were observed over a two week period with one being March 13, 2013 and one incident being March 27, 2013. In addition, Officer Stutts appears to have been less then forthcoming when she forgets equipment and in fact was late responding to a call and could have jeopardized another officer's safety by her actions.

Gregory and Seely concluded that Stutts's claims of retaliation were unfounded.

On April 12, 2013, Stutts failed to follow instructions from Sgt. Hill to put information about a vehicle crossing the center line of traffic in an accident report and proceeded to question Capt. Martens about the issue.

On April 12, 2013, Asst. Chief Terry asked via radio if any patrol officer had the McPherson Sheriff's Department battery charger. He was later informed by Lt. Reed that the charger had been found in Stutts's vehicle. When Terry asked Stutts about it, she agreed she was supposed to check the back seat of her vehicle prior to leaving but had failed to do so.

On April 25, 2013, Lt. Reed counseled Officers Stutts and Ramirez about failing to properly clean their handguns and informed them that the department was implementing a policy that directly addressed weapons that were not cleaned and maintained.

On May 2, 2013, a three-member panel heard Stutts's grievance of her February 27, 2013 discipline. The panel members were: (1) Tammy Seely, the city clerk; (2) Marla Hawkinson, a member of the McPherson Police Department; and (3) Marilyn Wilder, an

attorney from Newton, Kansas, selected by Stutts to serve on the panel. Stutts was represented at the hearing by attorney Ray Simmons.

On May 10, the grievance panel issued its findings. Among other things, it found that the discipline imposed by the City was reasonable and warranted under the circumstances.

On May 13, 2013, Mayor Brown, following City procedures, accepted the grievance panel's findings and conclusions and upheld the February 27, 2013 discipline.

On May 15, 2013, Chief McClarty sent Stutts a letter outlining the disciplinary incidents that had occurred between February 28, 2013 and May 15, 2013. McClarty advised Stutts that if she did not accept a new suspension and did not sign and return to him a performance plan by 8 a.m. on May 20, 2013, he would recommend to the McPherson City Commission that she be terminated.

On the morning of May 20, 2013, after hearing from McClarty that Stutts did not respond to him by the 8 a.m. deadline, the City Commission voted to terminate Stutts's employment.

Later on the morning of May 20, 2013, Stutts approached Mayor Brown with a written request for a grievance hearing. The request responded to allegations made by Chief McClarty in his May 15 letter and asserted that she was being subjected to a double standard.  Stutts testified in her deposition that she had seen male officers have heated discussions with their supervisors, agree to disagree, and then move on, but that her discussions were labeled as "argumentative."

15

On May 21, 2013, Brown responded that he was unclear what Stutts was requesting a grievance from but that she had been terminated and no grievance was available.

On July 13, 2013, Chief McClarty filed a notice of termination with the Kansas Commission on Peace Officer Standards and Training (CPOST), which stated that Stutts was terminated for "[n]umerous and continued performance issues without acceptable improvement after coaching, counseling and/or discipline."

On July 13, 2013, Stutts filed a second charge of discrimination against the City with the EEOC, alleging gender discrimination and retaliation.

During her employment with the City of McPherson, Stutts was one of only two female officers in a department with 40 officers. Stutts was the only female patrol officer out of 26 patrol officers.

After Stutts's termination, and prior to April 15, 2015, the City hired nine more officers, two of whom were female.

Between December 16, 2009 and November 15, 2014, the City received a total of 56 applications from females for positions within the police department. (The applications were from 52 different individuals; two applicants submitted multiple applications.) The City hired two of the applicants, one of whom left within six months of being hired.

Between March 25, 2008 (the date of Stutts's hire) and April 13, 2015, the City hired 15 male patrol officers.

To be considered qualified for a police officer position with the City, the applicant must pass a written test, physical agility test and background investigation; cannot have used illegal drugs within the past two years and must never have sold illegal drugs; must not have a felony conviction; must be of good moral character; and must be without impeachment (*Brady-Giglio*) issues. Dkt. 51-1 at 2-4.

### III. Discussion

Plaintiff claims she was discriminated against on the basis of gender, in violation of Title VII, both in the denial of appointment to a P-1 patrol officer position and in the termination of her employment from the City.  She further claims the City violated Title VII by retaliating against her for complaining of gender discrimination. Finally, she contends the City violated her right to equal protection of the laws under the Fourteenth Amendment by treating her in a disparate manner based upon gender. Dkt. 37 at 10.

Under Title VII, it is unlawful "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, or conditions of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Title VII actions alleging intentional discrimination are known as "disparate treatment" cases. *Ricci v. DeStafano,* 557 U.S. 557, 577 (2009). In a disparate treatment case alleging gender discrimination, a plaintiff must show: (1) she suffered a tangible employment action, (2) she was qualified for the position at issue, (3) she was treated less favorably than others because of her sex, and (4) the action was motivated by discriminatory intent. *Id.; Sanchez v. Denver Public Schools,* 164 F.3d 527, 531 (10th

Cir.1998). *See Groff v. Donahoe*, No. 13-2356-JTM, 2015 WL 4275673, at *7 (D. Kan. July 14, 2015).

In the absence of direct evidence of discriminatory intent, a Title VII violation can be proved with circumstantial evidence.  A plaintiff may prove discriminatory intent by showing that "the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 800 (10th Cir.2007); *Groff,* 2015 WL 4275673, at *8. In analyzing such claims, the court uses the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under *McDonnell Douglas,* the plaintiff must first establish a prima facie case of discrimination. If plaintiff does so, the employer must then identify legitimate, nondiscriminatory reasons for its action. Finally, if the employer meets that burden, the plaintiff must then establish that the employer's articulated reason was a pretext to mask unlawful discrimination. *McDonnell*, 411 U.S. at 802–04.

The City contends it is entitled to summary judgment on all claims. Dkt. 39. With respect to the P-1 position, the City argues both that the position was not a promotion covered by Title VII and that the City has established a legitimate non-discriminatory reason for its decision, which plaintiff has failed to rebut with evidence of pretext. As to plaintiff's claim of unlawful termination, the City argues that plaintiff fails to make a prima facie case of discrimination and fails to cite evidence showing that the City's justification is a pretext. On plaintiff's retaliation claim, the City argues there is no evidence of a causal connection between plaintiff's complaint and her termination, and

(again) that there is no evidence the City's justification is a pretext. Finally, the City argues that plaintiff's equal protection claim fails for the same reasons expressed above.

A. <u>Failure to select plaintiff for the P-1 position</u>. The City claims it selected Officer Ramirez over plaintiff for the P-1 position because Chief McClarty believed Ramirez was better qualified. Dkt. 39 at 21. In response, plaintiff does not address the relative merits of the candidates, but simply asserts that McClarty "had knowledge of the tainted nature of the counseling and discipline doled out to Stutts" when he made the decision. Dkt. 48 at 24. That allegation is conclusory, however, and is not supported by any evidence which could reasonably show that McClarty knew the discipline imposed on Stutts was unwarranted. Plaintiff cites no evidence to suggest that McClarty believed plaintiff's conduct did not warrant discipline. Nor does she cite evidence that McClarty did not genuinely believe Ramirez to be better qualified. The uncontroverted facts show that the discipline imposed by McClarty was later reviewed by a grievance panel and was found to be justified. Simply calling the discipline "tainted" does not raise a genuine issue of pretext.  Nor does plaintiff cite other evidence potentially showing that the City's explanation is unworthy of belief. Plaintiff claims the City's explanation is "inherently contradictory," Dkt. 48 at 24-25, but she does not explain the alleged contradiction. The argument seems to rest on a faulty premise that it is somehow inconsistent for the City to argue that selection for a P-1 position was not technically a promotion while at the same time asserting that McClarty chose Ramirez because he was better qualified. The court sees no inconsistency justifying an inference of pretext. *See also Santana v. City & Cnty. of Denver*, 488 F.3d 860,

865 (10th Cir. 2007) ("We will draw an inference of pretext where the facts assure us that the plaintiff is better qualified than the other candidates for the position," but that generally requires "demonstrating an overwhelming merit disparity" rather than minor differences in qualifications. ).

A plaintiff demonstrates pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005). Because plaintiff has failed to cite evidence that the City's explanation for this employment decision was a pretext, the City is entitled to summary judgment on this claim.

B. Plaintiff's termination. The City contends plaintiff was terminated "for numerous and continued performance issues without acceptable improvement after coaching, counseling, and/or discipline and for failing to agree to a performance improvement plan." Dkt. 39 at 24. In an attempt to show pretext, plaintiff first "contest[s] the factual basis for the appropriateness of the counseling or discipline." Dkt. 48 at 25. Second, plaintiff argues that "the statistical pattern of hiring new patrol officers in the police department" raises an inference of discriminatory hiring and, by extension, suggests pretext in the justification for her dismissal. *Id*. at 28-30. Even in the light most favorable to plaintiff, however, the uncontroverted facts could not

reasonably support a finding that the City's justification for her termination was a pretext.

Plaintiff argues the disciplinary actions against her are suspect because they involved credibility determinations and she disputes the underlying bases for the discipline. But as the City points out, it is not enough to challenge the City's factual conclusions. "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*, not as they appear to the plaintiff." *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (internal quotation marks omitted) (quoting *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (emphasis in original). Moreover, the court does not ask "whether the employer's proffered reasons were wise, fair or correct," but only "whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Debord*, 737 F.3d at 655.

Plaintiff cites no evidence reasonably calling into question the genuineness of Chief McClarty's conclusion that plaintiff's conduct warranted discipline. Nor does she cite evidence casting doubt on McClarty's belief (or the City's belief) that termination was warranted for plaintiff's failure to timely accept a performance plan. (Plaintiff does not even address the failure to accept a performance plan, which McClarty made a condition of her continued employment). Although plaintiff claims she was a victim of bias in the police department, her February 27, 2013, discipline was based in part on several citizen complaints that originated outside of the department. Plaintiff's supervisors clearly had a factual basis for believing she was causing an unacceptable

level of resentment in citizens with whom she came in contact. Plaintiff cites no evidence that other similarly situated officers were not counseled or disciplined for such complaints. The uncontroverted facts also provided a basis upon which plaintiff's supervisors could find that she was highly resistant to feedback or counseling. On more than once occasion she dismissed a critique of her behavior by asserting that the person involved was an "ass" or by denying that she had done anything wrong. On February 27, 2013, the same day plaintiff was disciplined for an accumulation of prior incidents, she engaged in behavior that generated another citizen complaint, when she argued over the phone with a U-Haul representative and then abruptly ended the conversation with the comment, "I can't talk to him." When her supervisors sought her version of events, she denied having been rude and blamed the U-Haul representative for being argumentative. Plaintiff dismisses these incidents as "subjective" and claims they did not violate any specific policy, but she cites no evidence to undermine the City's assertion that it genuinely believed her problems dealing with the public warranted the discipline imposed and that her repeated instances of such conduct — without an apparent willingness to correct them — warranted increased discipline.

Plaintiff's reliance on statistical evidence fares no better. As the City points out, in an attempt to suggest discrimination plaintiff cites the number of males hired versus the number of females hired and then points to the total number of female applicants. But this fails to demonstrate a significant disparity between comparable individuals. The total number of female applicants does not take into account how many of those individuals were later screened out for failure to meet the minimum qualifications. The

total number of male applicants and/or total qualified male applicants is not cited by plaintiff or compared to the number of females. The most relevant comparison – between qualified male and female applicants – is nowhere to be found in plaintiff's evidence. The evidence that is set forth provides no basis for a finding of pretext on plaintiff's disparate treatment claim. *See Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009) ("In order for statistical evidence to create an inference of discrimination, the statistics must ... eliminate nondiscriminatory explanations for the disparity. In other words, a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals."); *Sanders v. SW Bell Tel. L.P.*, 544 F.3d 1101, 1110 (10th Cir. 2008) (because plaintiff's statistics do not take into consideration nondiscriminatory reasons for the disparity – for example, differences in various individuals' experience and training – they do not constitute evidence of pretext).

C. <u>Retaliation</u>.  Plaintiff additionally claims the City retaliated against her for alleging she was being discriminated against on account of sex. Title VII prohibits discrimination against an individual for opposing any act or practice made unlawful under Title VII. 42 U.S.C. §2000e-3. But even assuming plaintiff could make out a prima facie case of retaliation — such as by showing a temporal connection between her complaint of discrimination and the City's disciplinary actions and/or her termination — she ultimately fails to cite evidence tending to show that the City's justification amounts to pretext. Plaintiff relies here on the same evidence of pretext cited in support of her other claims. *See* Dkt. 48 at 31. For reasons previously expressed by the court,

however, that evidence fails to raise a genuine issue of fact on plaintiff's claim that the City's justifications amounted to pretext. The City is therefore entitled to summary judgment on this claim as well.

D. Equal Protection claim. Plaintiff agrees that the same presumptions and burdens applicable to her Title VII claims apply as well to her Equal Protection claim. Dkt. 48 at 31. Under those standards, the City is entitled to summary judgment because the evidence cited will not reasonably support a finding that the City's justifications for disciplining plaintiff and terminating her employment were pretextual.

**IT IS THEREFORE ORDERED** this 22nd day of December, 2015, that the City of McPherson's Motion for Summary Judgment (Dkt. 38) is GRANTED.

_____s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE